## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

KENNETH J. GAMBLE,       )
                             )
      Plaintiff,          )
                             )
v.                          )
                             )   Case No.:  7:17-cv-01147-JHE
MERCEDES-BENZ U.S.      )
INTERNATIONAL, INC.,     )
                             )
      Defendant.      )
                             )

## MEMORANDUM OPINION[1]

Plaintiff Kenneth J. Gamble ("Gamble" or "Plaintiff") brings this employment discrimination action against Defendant Mercedes-Benz U.S. International, Inc. ("MBUSI" or "Defendant").  (Doc. 1).  MBUSI has moved for summary judgment on Gamble's sole claim.  (Doc. 22).  Gamble opposes this motion, (doc. 28), and MBUSI has filed a reply brief in response, (doc. 30).  The motion is fully briefed and ripe for review.  (Docs. 23, 28 & 30).  For the reasons stated more fully below, the motion is **GRANTED**.

### I. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment.  (Doc. 10).

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id.* at 324. (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. Summary Judgment Facts

### A. Background and MBUSI Policies

MBUSI operates an automotive manufacturing facility in Vance, Alabama. (Declaration of David Olive, doc. 24-1 ("Olive Decl.) at ¶ 2). Gamble, a former employee of MBUSI, first began working there on March 1, 1999. (Deposition of Kenneth J. Gamble, doc. 24-5 ("Gamble Depo.") at 7 (23:2-4)). During the time relevant to this case, Gamble worked as a maintenance team member at MBUSI. (Gamble Depo. at 7 (24:12-20)). Gamble worked under a group leader, Scotty Morris ("Morris"), and a manager, Scott McCall ("McCall")). (Gamble Depo. at 8 (27:8-17)). Prior to the incident at issue in this case, Gamble had never been disciplined. (Declaration of Kenneth J. Gamble, doc. 29-2 ("Gamble Decl.") at ¶ 5; Deposition of David Olive, doc. 24-2 ("Olive Depo.") at 16 (60:8-10)). Gamble was evaluated yearly and received very favorable evaluations each year of his employment with MBUSI, and his supervisors considered him to be honest. (Gamble Depo. at 8 (26:17-27:4, 28:20-29:7); Gamble Decl. at ¶ 4; Olive Depo. at (41:9-14), (60:5-7); Deposition of Scotty Morris, doc. 24-6 ("Morris Depo.") at 4 (10:14-11:2)).

MBUSI has an Equal Employment Opportunity Policy which prohibits discrimination or retaliation. (Gamble Depo. at 8 (25:1-15), 32 (Exh. 1)). Under that policy, team members can bring their concerns about discrimination or retaliation to MBUSI's Human Resources ("HR") Department. (Gamble Depo. at 32 (Exh. 1)). MBUSI also has a team member handbook containing this policy; the handbook is available to all team members via MBUSI's intranet and at kiosks located in the atria at MBUSI's facility. (Olive Depo. at 8 (25:13-26:8) 10 (33:3-34:2)).

MBUSI's Team Relation Regulation, HR06, addresses discipline and Corrective Performance Reviews. (Olive Depo. at 10 (34:7-37:3), 37-44 (Exh. 1)). This regulation applies to all managerial and non-managerial employees. (Olive Depo. at 8 (25:13-26:13)). HR06

contains a "Concerns Resolution" framework, designed "to establish a formal system to receive, review and resolve all work related suggestions, misunderstandings or disagreements . . . ." (Olive Depo. at 38-40 (Exh. 1)). The Concerns Resolution procedure suggests that team members with concerns first raise them with their supervisor; if the concern is not resolved, the team member should contact his or her HR Representative. (*Id.*).

Among other conduct, HR06 prohibits "[e]ngaging in harassment of any kind." (Olive Depo. at 10 (34:9-35:4), 38-40 (Exh. 1)). This offense is one of several that MBUSI describes as "so serious, severe, or unacceptable that it is outside the realm of a corrective performance review and employment may be terminated or temporarily suspended on the first incident." (Olive Depo. at 41 (Exh. 1)). To "determine the correct actions needed to prevent recurrence" of conduct subject to a Corrective Performance Review, HR06 indicates MBUSI will "[e]valuate the circumstances of the situation," "[d]etermine levels and types of corrective performance reviews and actions as business needs warrant," and "[b]ase determinations on a case-by-case basis." (*Id.*). And the regulation states that MBUSI considers the following in coming to an actual determination: the seriousness of the action, contributing circumstances, prior work record, actions taken with other team members in similar situations, intent, effect on fellow team members and/or business interests, and other relevant factors. (*Id.* at 42 (Exh. 1)).

Although it generally follows a progressive discipline policy, MBUSI has a zero-tolerance policy with respect to some behaviors, such as bringing a weapon to work, substance abuse, acts of violence, and using racial slurs; engaging in one of those behaviors results in immediate termination. (Olive Depo. at 8-9 (26:14-17, 29:10-30:10)). Although HR06 facially does not distinguish between racial and sexual harassment, David Olive ("Olive"), MBUSI's Senior Manager of HR, testified that the company's zero-tolerance policy with respect to racial

4

harassment, which results in more serious treatment than sexual harassment, stems from the company's "particular disdain for harassment of a racial nature"; those sorts of incidents are inflammatory to the plant's workforce. (Olive Depo. at 33 (127:9-128:17)). Olive testified he was unaware of "any racial slurs that have been investigated and found to have been factual" in which MBUSI had chosen any action but termination. (Olive Depo. at 9 (31:11-32:6)). Teresa Works, a Team Relations Representative at the time of the events giving rise to this lawsuit, was also unaware of any racial harassment charges that did not end in the employee's termination. (Deposition of Teresa Works, doc. 24-3 ("Works Depo.") at 20 (73:6-9)).

## B. Gamble's Firing

At around 2:30 a.m. (late in the shift) on September 4, 2015, Gamble was in the MBUSI maintenance room along with at least two other members of the maintenance team: Eric Sprowl ("Sprowl," a black male) and Dennis Finnen ("Finnen," a white male). (Gamble Depo. at 11-12 (39:1-41:20, 43:5-8); Olive Decl. at ¶ 7). Gamble heard what he described as "an eruptive multiple people at one time screaming and cackling and making a noise." (Gamble Depo. at 12 (43:13-16)). The noise was from a group of employees of ARD, a MBUSI subcontractor that works on off-line assembly. (Gamble Depo. at 15 (55:15-20); Gamble Decl. at ¶ 6). ARD's employees are primarily black, although Gamble testified he did not know the races of the people making the noise. (Gamble Depo. at 16 (57:1-4); Gamble Decl. at ¶¶ 6-7). Someone then asked Gamble "what in the hell were these people screaming about" and he responded: "sounds like a bunch of monkeys in the jungle or monkeys on a vine," although he did not recall the exact words he used. (Gamble Depo. at 12 (43:5-44:12), 14 (51:5-14)). Gamble testified he did not mean anything racial by the comments, and they were not directed at Sprowl. (Gamble Depo. at 12-13 (44:16-17, 47:4-

20)).  Neither Sprowl nor Finnen said anything to Gamble at the time, nor during the next two nights.  (Gamble Decl. at ¶¶ 8-9).

Three days later, on September 7, 2015, Sprowl sent an email to Morris requesting a meeting "ASAP next week to address and [sic] issue that came up Friday [September 4] evening." (Morris Depo. at 5 (15:11-16:6); doc. 24-4 at 13).  Sprowl stated it was "of the up [sic] most importance," but that it could wait until he returned to work the next week.[2]  (Doc. 24-4 at 13). When Sprowl returned to work on September 14, 2015, he sent Morris the following email (copying Works):

> Scotty,
>
> I wanted to inform you about an incident that happened on Friday, September 4th, 2015 at the end of production.
>
> My teammate Ken Gamble made a "degrading" and "racist" remark about a group of Black, ARD employees.  The comment was also very insulting and degrading towards me as well.  This has made me very uncomfortable being around Ken at this point.  Below are the details of the incident.  (Ken Gamble, Dennis Finnen, and me were sitting in the WO26 out-post after production had just stopped for the weekend.  As the ARD group was preparing to leave for the night they started getting loud and laughing.  Dennis commented that they need to hurry up and leave with the noise.  Ken then commented looking at Dennis:  "You know how those people are, they are like wild animals swinging in the trees, you can't teach them how to act no way, they don't know any better").
>
> Ken did not smile nor did he seem to care that he had just completely insulted me and that group of Black ARD team members.  To call a group of people "wild animals" swinging in trees (AKA – monkeys) is completely out of line and I consider it to be "**Racist**" and it has no place in a professional environment.  To think that he will be giving me orders as a Team Leader makes this even worst [sic]. I can't work with someone that thinks I am an animal and has no regards for my feeling.  I won't be disrespected like this!  I want an official complaint filed with

_____

[2] Maintenance team members had unusual schedules, so Sprowl was off work the week following the incident.  (Morris Depo. at (16-17)).

HR.  I spoke with Dennis about the incident, he agreed that it was wrong and it
embarrassed and offended him as well.

(Doc. 24-4 at 14) (emphasis in original).

Morris met with Sprowl privately after receiving this email.  (Morris Depo. at 6-7 (18:21-19:12)).  Sprowl seemed upset to Morris, and indicated he wanted to file a complaint with HR.[3] (*Id.*).  After meeting with Sprowl, Morris informed Works that Sprowl would like to speak with her.  (*Id.*).  Sprowl then completed a formal complaint in which he restated the content of his email, again characterizing Gamble's statement as: "You know how those people are, they are like wild animals swinging in the trees, you can't teach them how to act no way, they don't know any better." (Olive Decl. at ¶ 4; doc. 24-1 at 9).

Works, whose responsibility was to find out the facts surrounding the incident, began an investigation.  (Works Depo. at 7-11 (21:3-37:7)).  Her only role in the investigation was to get the statements; she then turned the information over to her supervisor, Team Relations Manager Zina Cooper ("Cooper").  (Olive Depo. at 5 (14:11-15, 15:2-12), 16 (57:9-22); Works Depo. at 7 (21:3-22:8), 11 (37:3-21), 19 (69:22-72:23)).  Works took statements from Finnen and Gamble. Finnen characterized Gamble's remarks as: "They are just a bunch of monkey's [sic] you can't expect any more from them.  All they know is swinging from vines." (Doc. 24-2 at 51).  According to his statement, Finnen felt shame for Gamble and bad for Sprowl; Finnen indicated Gamble had "no filter and no compassion."  (*Id.*).   In a subsequent statement, Finnen indicated Gamble had later told him "Boy, I almost messed up," to which Finnen had replied "yeh you did."  (Doc. 24-

---

[3] Gamble testified he was told Sprowl had been "pushed" into filing a complaint by Christy Gardino, another maintenance team member whom Gamble believes wanted his job.  (Gamble Depo. at 28 (108:4-11), 30 (115:3-15)).

5).  Gamble's statement indicated he had said "something like (do not know exact words) sound like a bunch of Monkey's [sic]."  (Gamble Depo. at 16 (59:21-60:11)). 59 (Exh. 9)).  Works also met with Gamble on September 15, 2015.  (Gamble Depo. at 57 (Exh. 7)).  According to Works's notes, Gamble told Works he "was thinking that the sounds were like on a movie, noise in a jungle, and I said, 'Sounds like a bunch of monkeys.'"  (*Id.*).  Gamble said "Eric [Sprowl] is a great guy . . . I think the world of Eric and he is the last person I would want to offend." (*Id.*).  Gamble also told Works he did not know if the people making the noises were black or white.  (*Id.*).  Works did not investigate whether any of the employees making noise had heard Gamble's comments.  (Works Depo. at 8 (28:1-10); Olive Depo. at 34-35 (132:16-133:1)).  Works made no recommendation regarding discipline for Gamble and had no role in the decision to discharge Gamble.  (Works Depo. at 11 (37:3-10)).

MBUSI initially suspended Gamble pending the completion of the investigation.  (Gamble Depo. at 13 (48:8-15)).  On September 17, 2015, Olive called Gamble to tell him that Olive would be back in touch with the company's decision.  (Gamble Depo. at 18 (65:6-22)).  Investigating the incident, Cooper reviewed the statements gathered by Works and prepared an investigation summary report.  (Olive Decl. at ¶ 5; doc. 24-1 at 11).  The report concluded "[t]he comment reported as being offensive was corroborated by the witness and the accused." (Doc. 24-1 at 11).  Cooper recommended to Olive that Gamble be discharged for violating HR06.  (Olive Decl. at ¶ 6).  Olive considered the HR06 factors—the seriousness of the action, contributing circumstances, prior work record, action taken with other team members, intent, effect on fellow team members, and other relevant factors—and decided to terminate Gamble.  (Olive Depo. at 16-17 (59:12-63:2), 20-21 (74:7-10, 76:7-77:7); 34 (129:15-130:2)).  Olive testified this was consistent with MBUSI's past practice: specifically, that he could not find an incident where a

team member had made a racially offensive remark, corroborated by witnesses and admitted to by the team member, that had not resulted in termination. (*Id.*).

On September 18, 2015, Olive recommended to MBUSI's vice president that Gamble be terminated, and the vice president approved Gamble's termination the same day. (*Id.* at 16 (57:11-22); doc. 24-4 at 19). Olive called Gamble that day and told him that he would be terminated. (Gamble Depo. at 17 (65:2-5)). MBUSI issued a Corrective Performance Review to Gamble indicating he had violated HR06 due to "racially derogatory comments" and sent Gamble a letter terminating his employment effective September 18, 2015. (Doc. 24-4 at 18-19). Two days later, Gamble sent an email to MBUSI's president requesting another chance; Gamble admitted he had made an inappropriate comment but again denied it was meant as a racial remark. (Gamble Depo. at 22 (81:14-19), 68 (Exh. 14).

### C. The "Boo" Remarks

After Gamble was terminated, Cooper attended a monthly maintenance meeting at which a team member asked if Gamble was fired because he had complained about a group leader referring to him as "boo." (Olive Depo. at 26 (98:10-23), 52 (Exh. 7); Works Depo. at 13 (45:3-47:15), 16-17 (60:1-61:3)). Cooper had never heard about this complaint and asked Works if a formal complaint had been filed. (Works Depo. at 13 (46:14-48:3), 16-17 (60:1-61:3), 23 (Exh. 11)).

Works recalled an incident in a monthly maintenance meeting in 2014 at which Gamble brought up the fact that a black female group leader, Ronnie Smith ("Smith"), referred to him as "boo" over the radio. (Works Depo. at 13-14 (48:4-52:5), 23 (Exh. 11)). At this meeting, Gamble had had many "gripes"; Works characterized the "boo" issue as one of these gripes. (*Id.* at 14 (50:19-52:3)). Works recalled Gamble saying something like "my name is not 'boo,' I have a

name," but he did not say he did not like the term or identify the group leader; Works characterized it as a "term of endearment" and said she had had people say that to her as well. (*Id.* at 23 (Exh. 11)). Works did not investigate the complaint further, nor did she escalate it; Olive testified the complaint was never passed on to him, nor was he involved in investigating Gamble's complaint. (*Id.* at 14 (52:1-3), 23 (Exh. 11); Olive Depo. at 53:54:1). Works testified there was no reason to investigate further or escalate, as the term "boo" was not against regulations, it was not a safety issue, and Gamble had not said he did not like it. (Works Depo. at 14 (50:5-51:20-23)).

Gamble described the situation as follows: "[Smith] would call us out instead of by name, she would call us out to a job using Boo or asked us when we were working on a piece of equipment, how long was it going to take you to get it fixed, Boo, can you come down here and work on this, Boo. The only time she communicated with us was to have us work on a piece of equipment that she was — her and her people, production people, was in charge of running." (Gamble Depo. at 19 (72:13-21)). Smith would use the term with other maintenance workers as well, including other members of his team such as Finnen and Sprowl.[4] (*Id.* at 20 (73:7-74:1)). At the maintenance meeting in question, Gamble spoke up and told Works he had a problem with a production group leader, but did not identify her by name.[5] (*Id.* at 19 (76:11-19)). Gamble testified he stated the comment was "offensive and it offends me, other people is offended . . . and

---

[4] In his declaration submitted alongside his summary judgment brief, Gamble indicates that Smith would use "boo" to refer to members of the "all Caucasian" maintenance team. (Gamble Decl. at ¶ 18). This is both inconsistent with the undisputed fact that Sprowl, an African-American, was part of the maintenance team, (Gamble Depo. at 10 (34:5-13)), and the cited deposition testimony above indicating Smith used the term to refer to Sprowl.

[5] Gamble testified he believed Works was "really good friends" with Smith, and his report "pissed her off." (Gamble Depo. at 23 (86:1-13)). However, Works testified she only learned Gamble was referring to Smith much later (after Gamble was terminated), that she was not "good friends" with Smith, and that they never socialized. (Works Depo. at 14-15 (52:16-53: 17)).

I'm telling you to stop it." (*Id*. at 21 (77:11-18)). About two weeks before Gamble was terminated, Smith called him "boo" again, and Gamble told Morris he was "tired of hearing it" and wanted "HR down here ASAP." (*Id*. (78:7-79:17)). Gamble testified it "sounded like she was making a racial statement towards a Caucasian guy," but he never indicated to anyone the comment was racially offensive.[6] (*Id*. (79:20-80:23)).

Like Works, Morris took Gamble's comments regarding the "boo" comments as "griping" unworthy of further investigation. (Morris Depo. at 4-5 (11:3-13:3)). Morris did not consider Gamble's remarks to be formal complaints, nor did he recall Gamble stating that the "boo" remarks were offensive. (*Id*.).

After hearing the maintenance team members question whether Gamble had been terminated for "boo"-related reasons, Cooper emailed Olive on October 1, 2015. (Olive Depo. at 53-54 (Exh. 8)). In her email, Cooper indicated "boo" was not comparable to the use of "[k]nown racially derogatory statements" and, in any event, "neither HR Manager, Sr. Mgr, VP HR (present or incumbent), President, or Attorney had any knowledge of" Gamble's concerns about being referred to as "Boo." (*Id*.). Cooper also indicated Works "was not present nor was she asked to participate in the decision [to terminate Gamble] because of the sensitive nature of the decision to be made." (*Id*.).

Gamble filed an EEOC charge alleging retaliation for complaining about being referred to as "Boo" on January 14, 2016. (Gamble Depo. at 70-71 (Exh. 15)). He received a right to sue letter on November 4, 2016. (Gamble Depo. at 72-73 (Exh. 16)).

---

[6] For her part, Smith testified she did not know Gamble and used "Boo" as a friendly term to address a person over the radio if she did not know their name. (Deposition of Ronnie Smith, doc. 24-7 ("Smith Depo.") at 4-5 (10:9-13:6)).

### D. Other Employees Disciplined for Harassment [7]

In his deposition, Gamble identified several MBUSI employees accused of various forms of harassment but not terminated: Rick Clark, Mike Banks, Jassen Tidwell, Fred Rodgers, Richard Kelly, Tracey McKee, Phil McDuff, Tim Conway, Cecil Agee, Tim Lee, David Shaun Battles, Toby Avery, Shedrick Kynard, Dwight Moore, Harold Hand, and Joe Causey. (Gamble Depo. at 23 (88:2-105:22)). Although he could not remember details regarding what some of these employees had been accused of at his deposition, Gamble's declaration sets out his recollection "after further review and speaking with former employees" of his beliefs regarding what the employees had done. (Gamble Decl. at ¶ 24). With the exceptions of Hand and Kelly, each of these was accused of sexual harassment. (*Id.*). Gamble did not recall what Hand or Kelly had done at his deposition, but agreed that he had only heard things from other team members regarding their conduct. (Gamble Depo. at 25 (93:2-94:4), 26-27 (104:16-105:11)).

In his declaration, Gamble stated Kelly, a group leader, "had both racial and sexual harassment complaints against him," resulting in a talking-to by management and no further discipline. (Gamble Decl. at ¶ 24). Olive has attached a copy of Kelly's July/August 2010 discipline records to his declaration. (Olive Decl. at ¶ 13; doc. 24-1 at 19-21). Kelly received a note in his file on July 26, 2010, indicating he was reminded MBUSI's policy was to "treat [other team members] with the upmost [sic] respect and professionalism in every aspect of day to day

---

[7] Gamble's response states "[t]he defendant has failed to produce records on whether certain employees, at least 7, who violated the harassment policy prior to 2010," citing a letter from his counsel to MBUSI's counsel. (Doc. 28 at 7) (citing doc. 29-11). To the extent Gamble contends this is relevant, the undersigned notes Gamble never brought this dispute to the court's attention during discovery. Having failed to move to compel the information, Gamble cannot request the undersigned draw a conclusion from its absence at summary judgment.

business." (Doc. 24-1 at 19). Kelly also received a Corrective Performance Review on August 17, 2010, indicating he was "in violation of the MBUSI Code of Conduct Policy IV Policy B.1. Using abusive language or action toward a fellow TM" after confronting another employee. (Doc. 24-1 at 20). Olive testified MBUSI's investigation did not uncover "anything racial or sexual" with respect to Kelly. (Olive Depo. at 30 (114:6-4)).

Gamble indicated "Mr. Hand made a racially derogatory comment towards a group of African-American team members," resulting in a Level 3 Corrective Action. (*Id.*). In his declaration, Olive indicated Hand had "not been the subject of a charge of harassment in violation of MBUSI's Regulations" since 2010. (Olive Decl. at ¶ 25).

Another employee, Scott Llewellyn, was demoted from his group leader position in May 2018 after making a reference to an African-American employee's dreadlocks when the employee passed a drug test. (Olive Depo. at 21 (78:4-80:18)). MBUSI's investigation did not determine Llewellyn's comment was racially derogatory or a racial slur, and while the team member had complained that he was offended by Llewellyn's statements, Olive testified it was because the employee felt he was being stereotyped. (*Id.* at 21 (78:4-80:18), 35 (134:3-135:7)).

## III. Analysis

Gamble's complaint raises claims of retaliation in violation of Title VII and 42 U.S.C. § 1981.[8] (Doc. 1). Title VII bars an employer from retaliating against an employee who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or

---

[8] The same legal standard applies to retaliation claims under both Title VII and § 1981. *Locascio v. BBDO Atlanta, Inc.*, 56 F. Supp. 3d 1356, 1363 (N.D. Ga. 2014) (citing *Butler v. Ala. Dep't of Transp.,* 536 F.3d 1209, 1215 (11th Cir. 2008); *Goldsmith v. Bagby Elevator Co.,* 513 F.3d 1261, 1277 (11th Cir. 2008)).

hearing under [Title VII]." In a case relying (as here) on circumstantial evidence, the court generally applies the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800 (1973). Under this framework, a plaintiff must first establish a *prima facie* case of Title VII or § 1981 retaliation. To do so, the plaintiff must show that "(1) [s]he engaged in statutorily protected expression, (2) the employer took action that would have been materially adverse to a reasonable employee, and (3) there was some causal relation between the two events." *Worley v. City of Lilburn*, 408 F. App'x 248, 250 (11th Cir. 2011) (citing *Pennington v. City of Huntsville,* 261 F.3d 1262, 1266 (11th Cir. 2001)). A retaliation plaintiff must show that the "protected activity was a but-for cause of the alleged adverse action by the employer." *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 362 (2013). If the plaintiff makes this showing by a preponderance of the evidence, the burden shifts to the defendant employer to show a legitimate, nondiscriminatory reason for its actions. *Id.* at 1221 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). If the defendant does so, the burden shifts back to the plaintiff to "demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that "merges with the [plaintiff's] ultimate burden of persuading the [factfinder] that she has been the victim of intentional discrimination." *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1221 (11th Cir. 2019) (citing *Burdine*, 450 U.S. at 256).

MBUSI contends Gamble cannot show a *prima facie* case because any report he made regarding being called "boo" was not protected activity. (Doc. 23 at 23-25). Further, it argues Gamble cannot show a causal connection between his firing and the "boo" complaint. (*Id.* at 25-26). Finally, it denies Gamble can show pretext for the legitimate, non-discriminatory reason it

had for firing him: his allegedly racially offensive remarks. (*Id.* at 26-30). Each of these arguments is addressed below.

### A. Protected Activity

"Under the Opposition Clause of Title VII's anti-retaliation provision, an employee is protected from discrimination if she 'has opposed any practice made an unlawful employment practice by this subchapter.'" *Anduze v. Fla. Atl. Univ.*, 151 F. App'x 875, 878 (11th Cir. 2005) (citing 42 U.S.C. § 2000e–3(a)). To show protected activity under the Opposition Clause, a plaintiff must demonstrate "that he had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997). This contains both a subjective and an objective component:

> A plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented. It thus is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.

*Id.*

MBUSI argues Gamble fails both the subjective and the objective components of this inquiry. (Doc. 23 at 24). Subjectively, it points to Gamble's failure to indicate to anyone at MBUSI that he perceived "boo" as racially motivated. (*Id.*). Gamble responds that his deposition testimony and declaration support that he did perceive it as racially-based. (Doc. 28 at 11-12). Gamble's evidence for this is his testimony that "boo" was offensive to him because:

> The first thing is I didn't know what it meant, it sounded like she was making a racial statement towards a Caucasian guy, you know, I didn't know what it meant. That is the way I took it, you know, it was a comment that I was offended by and didn't like it.

(*Id.*) (quoting Gamble Depo. at 79:22-80:4)).  Gamble also points to his declaration, in which he states Smith referred to members of the "all Caucasian" maintenance team as "Boo," and indicated that his report to Works at the maintenance team meeting involved informing her that "we had a problem with the production GL calling the Caucasian guys 'boo' . . . ."  (*Id.* at 13).

As stated above, Gamble's declaration contradicts his deposition testimony regarding the racial makeup of the maintenance team.  *See supra*, n.4.  Not only is it undisputed (through Gamble's own testimony and otherwise) that Sprowl, an African-American, was a member of the maintenance team, his position on the maintenance team and race are central undisputed facts in Gamble's firing.  Further, Gamble specifically testified Smith also referred to Sprowl as "boo." (Gamble Depo. at 20 (73:18-74:1)).  Gamble offers no reason why his declaration's statement regarding the "all Caucasian" maintenance team merits consideration when it is clearly contradicted by his earlier testimony, and in any event the record blatantly undermines this claim. Therefore, the undersigned will not consider this claim.  *Akins v. Fulton Cty., Ga.*, 278 F. App'x 964, 968 (11th Cir. 2008) (quoting *Van T. Junkins and Assoc. v. U.S. Indus.*, 736 F.2d 656, 657 (11th Cir.1984)) ("[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony"); *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) (generally, "a plaintiff's testimony cannot be discounted on summary judgment unless it is blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law").

An employee alleging he engaged in protected activity must "at the very least, communicate [his] belief that discrimination is occurring to the employer and cannot rely on the employer to infer that discrimination has occurred."  *Demers v. Adams Homes of Nw. Fla., Inc.*,

321 F. App'x 847, 852 (11th Cir. 2009) (citing *Webb v. R & B Holding Co., Inc.*, 992 F. Supp.

1382, 1390 (S.D. Fla. 1998) (internal quotation marks omitted).  Although Gamble "felt like it was

driven toward white guys," (Gamble Depo. at 21 (80:5-10)), his deposition testimony indicates he

"didn't use the word racial" at the meeting, (*id.* (80:18-23)).  However, for the first time, Gamble's

declaration mentions race; he contends he reported to Works that Smith used the "boo" nickname

for "the Caucasian guys."  (Gamble Decl. at ¶ 20).  This does not directly contradict Gamble's

deposition testimony,[9] and giving him the benefit of the doubt, it is conceivable a jury could

conclude Gamble subjectively believed "boo" to have a racial component and reported enough of

that subjective belief to MBUSI.

That said, whatever belief Gamble entertained that "boo" was a racial slur directed at

Caucasians was objectively unreasonable.  First, as stated above, the undisputed evidence is that

Smith addressed the term "boo" to people of multiple races.  This included, in Gamble's own

testimony, African-American maintenance team member Sprowl.  (Gamble Depo. at 20 (73:18-

74:1)).  Gamble provides no explanation why a nickname directed at individuals of different races

could reasonably be considered a racial slur towards one of those races.  *See Brown v. City of*

*Opelika*, 211 F. App'x 862, 864 (11th Cir. 2006) (report of racial discrimination by African-

American woman not objectively reasonable when supervisor "took out her anger on everyone,

including [a] white office assistant")

---

[9] It does raise some questions about whether Gamble is using "the Caucasian guys" as a shorthand for "the maintenance workers."  As discussed above, the contention that the maintenance workers were all Caucasian is a non-starter.  However, for summary judgment purposes, the undersigned goes no further down this path and concludes Gamble's reference to "the Caucasian guys" can be harmonized with the undisputed facts.

Second, Gamble offers no basis for the undersigned to conclude that "boo" has a racial element. Attempting to rebut MBUSI's argument that "boo" is "no different than a myriad of friendly greetings such as . . . 'bud,' 'buddie,' 'brother,' or 'sister,'" (doc. 24 at 25), Gamble characterizes this as "the defendant's opinion not supported by any legal precedent nor . . . by the facts." But it is *Gamble's* burden to show his *prima facie* case, not MBUSI's. Gamble's argument boils down to the allegedly ambiguous nature of "boo"—i.e., it "leave[s] one to wonder what the person means." (Doc. 28 at 13). But the purportedly ambiguous meaning of "boo" does not support an objectively reasonable belief that it is a racial slur. While Gamble contends "a person could easily take offense" to a slang term with an unknown provenance, he fails to demonstrate that it would be objectively reasonable not only to be offended by a term or nickname one has not previously encountered, but to conclude, in the absence of any other factor, that its use is racially motivated. Gamble points to no circumstances in this case that would reasonably give rise to such a conclusion. Accordingly, he has failed to show he engaged in protective activity such that he could make out a *prima facie* case of retaliation.

### B. Causal Connection

To establish the third element of a retaliation claim, a plaintiff must show "the decision-makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." *McCann v. Tillman*, 526 F.3d 1370, 1376 (11th Cir. 2008) (citation and internal alterations omitted). MBUSI argues Gamble fails to show decision-maker knowledge of his "boo"-related report.

Even if Gamble had shown protected activity, his *prima facie* case would break down here. Gamble's first argument is that Works failed in her job by failing to investigate the "boo" comments. (Doc. 28 at 14-15). Had she done so, he argues, MBUSI's decisionmakers would have

known about his complaint and "a different decision would have been likely reached."[10] (*Id.* at 15). Gamble's argument seems to be that his "boo" complaint could have shielded him from termination, since MBUSI would not want to appear to be retaliating against him. The relevance of this is unclear, since "[d]iscrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent," *Silvera v. Orange County Sch. Bd.,* 244 F.3d 1253, 1262 (11th Cir. 2001). Gamble's burden is to show actual decisionmaker awareness of his protected activity leading to intent by the decisionmakers to terminate him for it, not that his protected activity would somehow have helped him keep his job had decisionmakers known about it. Whether Works should have investigated and/or escalated Gamble's report (and, thus, whether decisionmakers would have been in the loop and aware if she had done her job) is beside the point when it is undisputed that no one above Works was aware of the "boo" complaint. Gamble cannot show anyone's retaliatory intent based on what might have happened.

Gamble's other argument is that regardless of whether any of the decision-makers had a retaliatory motive (or awareness of the protected activity), the decision-makers were simply acting on the motives of Works, whom he claims was "the key instrumental investigator in both incidents." (Doc. 28 at 15). This is the so-called "cat's paw" theory of liability, which applies "when a biased actor recommends that an adverse employment action be taken against an employee, [even though] the biased actor is not the ultimate decision-maker." *Williamson v. Adventist Health Sys./Sunbelt, Inc.,* 372 F. App'x 936, 938 (11th Cir.2010) (citing *Stimpson v. City*

---

[10] A substantial portion of Gamble's response is apparently devoted to the argument that his "boo"-related complaint was inadequately investigated. (Doc. 28 at 18-22). Whether MBUSI took the complaint as seriously as Gamble would have liked is immaterial as to whether there was a causal connection between the complaint and Gamble's termination except to the extent discussed below.

*of Tuscaloosa,* 186 F.3d 1328, 1332 (11th Cir. 1999)). Under the cat's paw theory, a plaintiff may show causation if he "shows that the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee." *Stimpson*, 186 F.3d at 1332. There are several problems with this argument, starting with the fact that Works undisputedly did not make a recommendation at all, notwithstanding Gamble's intimations otherwise, (*see* doc. 28 at 16). Instead, her role was simply to secure statements from the participants and pass them along to Cooper. (Olive Depo. at 5 (14:11-15, 15:2-12), 16 (57:9-22); Works Depo. at 7 (21:3-22:8), 11 (37:3-21), 19 (69:22-72:23)). Since Works did not make a recommendation, and since it is likewise undisputed Works was the only person in the investigatory chain with knowledge of Gamble's complaint,[11] there can be no cat's paw. Further, although Gamble indicates that "Olive recommended the plaintiff be terminated based solely on Works' and Cooper's recommendation and [vice president] Paulous signed off on the recommendation without knowing any of the facts," (doc. 28 at 16-17), the evidence indicates Olive did not simply rubber-stamp anyone's recommendation; to the contrary, he testified he considered the factors in HR06 and past company practice before making his decision. (Olive Depo. at 16-17 (59:12-63:2), 20-21 (74:7-10, 76:7-77:7); 34 (129:15-130:2)). Even if Works had made a recommendation, Olive's independent inquiry would break the causal chain. *See Stimpson*, 186 F.3d at 1332 (finding an independent investigation can foreclose an asserted cat's paw arrangement).

---

[11] Morris also knew about Gamble's objection to being called "boo," but Gamble does not allege (and the evidence does not support) he had anything to do with Gamble's firing.

Without evidence of a causal connection between Gamble's "boo" complaint—even if it could be considered protected activity—MBUSI's motion for summary judgment is alternatively due to be granted due to Gamble's failure to show this element of his *prima facie* case.

### C. Pretext

Finally, and independently of either reason above, Gamble's evidence of pretext falls short. "The inquiry into pretext requires the court to determine, in view of all the evidence, 'whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct.'" *Crawford*, 529 F.3d at 976. A pretextual reason is not only one that is false but one that conceals an actual, discriminatory reason. *Brooks v. County Comm'n of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006).

MBUSI states it "discharged Plaintiff because it concluded in good faith that he had violated HR06 by making racially derogatory comments in the presence of other team members." (Doc. 23 at 27). Gamble's first salvo is to attack the legitimacy of MBUSI's reason. (Doc. 28 at 23). The starting component of this argument is Gamble's contention that MBUSI only had one reason for terminating him, not multiple reasons. (*Id.*). MBUSI never contends it had any reason beyond Gamble's racially derogatory comments, so it is difficult to see the point Gamble is trying to make here. Second, Gamble states the policy at issue forbids "harassment of any kind" without distinguishing between sexual and racial harassment. (*Id.* at 23-24). However, this does not account for Olive's testimony that the company's "particular disdain for harassment of a racial nature" has led it to a zero-tolerance policy with respect to racial harassment. (Olive Depo. at 33 (127:9-128:17)). Gamble's argument boils down to a belief that MBUSI should treat all

harassment the same, which simply questions the wisdom of MBUSI's policy.  This does not show pretext.  *Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997).

Gamble's final attack on the legitimacy of MBUSI's rationale is his contention he "NEVER admitted he made a racial slur," instead specifically denying that he intended anything racial by his reference to "monkeys."  (Doc. 28 at 23).  But as MBUSI points out—and as Gamble's own arguments regarding protected activity illustrate—the intent of the speaker is not dispositive of the issue.  What Gamble specifically admitted to is stating that other employees "sound[ed] like a bunch of monkeys in the jungle or monkeys on a vine," (Gamble Depo. at 12 (43:5-44:12).  Although Gamble states "the word 'monkey' is not always considered a racial slur," (doc. 28 at 23), this is again a question whether MBUSI appropriately concluded that, in this specific instance, Gamble's admitted comment could be construed as one.  But "federal courts do not sit as a super-personnel department that reexamines an entity's business decisions."  *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (citation and internal alterations omitted).  Instead, the question is whether the reason MBUSI articulated is one "that might motivate a reasonable employer" to terminate an employee, *see Chapman*, 229 F.3d at 1030.[12]  It clearly was.  The term "monkey" has a lengthy and ugly pedigree as a racial slur:

> "The use of the term 'monkey' and other similar words have been part of actionable racial harassment claims across the country." *Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 911 (8th Cir. 2006); *see also Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1269 (11th Cir. 2008) (describing "racial slurs," including the term "monkey" that were used against an African–American employee); *Walker v. Thompson*, 214 F.3d 615, 626 (5th Cir. 2000) (citing "comparisons to slaves and monkeys" among other harassment as sufficient to create a jury question with respect to a racially hostile work environment), *abrogated on other grounds by White*, 548 U.S. 53, 126 S. Ct. 2405,

---

[12] Notably, the issue is *not* whether Gamble's statement was legally sufficient to supply Sprowl with an actionable Title VII claim.

165 L. Ed. 2d 345. "Given the history of racial stereotypes against African–Americans and the prevalent one of African–Americans as animals or monkeys, it is a reasonable—perhaps even an obvious—conclusion that" the use of monkey imagery is intended as a "racial insult" where no benign explanation for the imagery appears. *United States v. Jones*, 159 F.3d 969, 977 (6th Cir. 1998) (addressing a selective prosecution claim); *cf. Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 647–48 (7th Cir.2011) (describing contexts in which managers might use monkey imagery for legitimate workplace purposes).

*Jones v. UPS Ground Freight*, 683 F.3d 1283, 1297 (11th Cir. 2012). *See also Smelter v. S. Home Care Servs. Inc.*, 904 F.3d 1276, 1286 (11th Cir. 2018) (reaffirming the rationale in *Jones*). Whether Gamble wishes MBUSI had erred on the side of finding this to be one instance in which that provenance could be disregarded is immaterial. And questioning the fairness of MBUSI's decision as applied to a long-term, otherwise good employee is not part of the court's inquiry. *Washington v. Kroger Co.*, 218 F. App'x 822, 826 (11th Cir. 2007) (citing *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002)).

Moving on from the legitimacy of MBUSI's rationale, Gamble's other effort to show pretext is by marshalling sixteen potential comparator employees who allegedly violated HR06 but received discipline short of termination. (Doc. 28 at 24-27). While the parties' briefs were under submission, the Eleventh Circuit clarified that a plaintiff must show he and any "proffered comparators were 'similarly situated in all material respects.'" *Lewis*, 918 F.3d at 1218. The court supplied several criteria that generally apply to a similarly situated comparator: he or she will ordinarily (1) "have engaged in the same basic conduct (or misconduct) as the plaintiff"; (2) "have been subject to the same employment policy, guideline, or rule as the plaintiff"; (3) "have been under the jurisdiction of the same supervisor as the plaintiff"; (4) and "share the plaintiff's employment or disciplinary history." *Id.* at 1227-28.

As a preliminary matter, notwithstanding Gamble's argument that all harassment in violation of HR06 *ought* to be treated the same, (doc. 28 at 24), the undisputed evidence is that MBUSI says it treats racial harassment in a harsher manner than sexual harassment. Accordingly, while showing that a comparator was accused of sexual harassment might show that the comparator was subject to the same general policy as Gamble (i.e., HR06), that comparator would not be similarly situated in the material respect of having engaged in the same basic misconduct as Gamble. So Rick Clark, Mike Banks, Jassen Tidwell, Fred Rodgers, Tracey McKee, Phil McDuff, Tim Conway, Cecil Agee, Tim Lee, David Shaun Battles, Toby Avery, Shedrick Kynard, Dwight Moore, and Joe Causey, each of whom was alleged to have engaged in sexual harassment misconduct (but not race-based misconduct) resulting in lesser discipline than termination, are not appropriate comparators.

That leaves Richard Kelly, Harold Hand, and Scott Llewellyn. But Gamble's evidence regarding these comparators is insufficient to make a comparison such that the undersigned could conclude any met Olive's criteria of a witness-corroborated racially offensive remark to which the employee had admitted.[13] (Olive Depo. at 16-17 (59:12-63:2), 20-21 (74:7-10, 76:7-77:7); 34 (129:15-130:2)). As for Kelly and Hand, Gamble's deposition testimony sheds no light on their conduct at all, and his clarifications in his declaration are not much more help. Gamble stated Kelly "had both racial and sexual harassment complaints," (Gamble Decl. at ¶ 24), but indicates nothing beyond this such as the time the complaints occurred or the nature of the complaints. Nor does he do so for Hand, indicating only that Hand "made a racially derogatory comment towards

---

[13] While Gamble provides disciplinary records from some MBUSI employees, he does not include records from any of these three.

a group of African-American team members, (*id.*). MBUSI's records do not support either was disciplined for anything similar to Gamble's comments at any point after 2010. [14] Gamble has not established either is an appropriate comparator.[15]

Llewellyn is a closer case, but ultimately Gamble falls short here as well. The only evidence in the record is that Llewellyn made a comment about an African-American employee's dreadlocks after the employee passed a drug test, which resulted in a complaint from the employee that he was being stereotyped. (Olive Depo. at 21 (78:4-80:18), 35 (134:3-135:7)). Although it is *conceivable* there could be a racial component to Llewellyn's statement—whatever it was— that could put it in the same category as Gamble's "monkey" comments and make Llewellyn an appropriate comparator, Gamble has failed to supply the court with any basis for drawing this conclusion. Nor has Gamble put forth any evidence regarding whether Llewellyn admitted to making the comment in question or whether the comment was corroborated by witnesses. It is Gamble's burden to show pretext, and he has failed to meet it as to any of his proposed comparators.

Finally, as MBUSI notes, Gamble must not only show that his firing was pretextual in that it was false, but that it was motivated by retaliation. *Brooks v. County Comm'n of Jefferson*

---

[14] Gamble reiterates his contention that a discovery dispute over documents prior to 2010 prevented him from coming forward with relevant documents. (Doc. 28 at 25). As stated above, this was never brought to the court's attention, and the undersigned will not assume that unproduced documents might provide evidentiary support for Gamble's claims. Further, Gamble is simply mistaken if he contends the time between his offense and his comparators' misconduct is not a relevant consideration. *See Lewis*, 918 F.3d at 1230 (finding as a "critical difference" between plaintiff and her comparators the fact that personnel actions against them were taken "years apart").

[15] In addition to the flaws noted above, Gamble's deposition and declaration do not support that he has any personal knowledge of whatever misconduct Hand or Kelly were accused of, but instead that he simply heard about their misconduct from unidentified other team members.

*County, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006). For the same reasons Gamble cannot show a causal connection between his complaint and his firing, he cannot show pretext either. Accordingly, MBUSI is due summary judgment for that reason as well.

### IV. Conclusion

For the reasons stated above, MBUSI's motion for summary judgment, (doc. 22), is **GRANTED**. Gamble's claims are due to be dismissed. A separate order will be entered.

DONE this 24th day of September, 2019.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE